UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN AYALA,<br><br>                                    Plaintiff,<br><br>v.<br><br>W. FERMON,<br><br>                                    Defendant. | Case No.: 14-cv-1794 GPC (JLB)<br><br>**REPORT AND RECOMMENDATION GRANTING DEFENDANT FERMON'S MOTION FOR SUMMARY JUDGMENT**<br><br>**[ECF No. 50]** |

Plaintiff Jonathan Ayala, a former state prisoner currently out of the state's custody on parole, is proceeding *pro se* in this civil action pursuant to 42 U.S.C. § 1983.  Defendant W. Fermon[1] is employed by the California Department of Corrections and Rehabilitation as a Security and Investigation Officer at Calipatria State Prison (ECF No. 50-5 at ¶ 1), where Plaintiff was formerly incarcerated (ECF No. 8 at 1).[2]

---

[1] Plaintiff's First Amended Complaint asserts claims against W. Fermon and W.L. Montgomery, Warden at Calipatria State Prison.  (ECF No. 8.)  Defendant Montgomery was dismissed from this case on June 16, 2015 (ECF No. 26), and Defendant Fermon remains the only Defendant.

[2] All citations to page numbers in this Report and Recommendation refer to the page numbers generated by the CM/ECF system.

1

1         Pending before the Court is Defendant's Motion for Summary Judgment pursuant to

2  Federal Rule of Civil Procedure 56.  (ECF No. 50.)  The Court submits this Report and

3  Recommendation to United States District Judge Gonzalo P. Curiel pursuant to 28 U.S.C.

4  § 636(b)(1) and Local Civil Rule 72.1 of the Local Rules of Practice for the United States

5  District Court for the Southern District of California.  After a thorough review of the motion

6  papers and evidence filed in support thereof, the Court **RECOMMENDS** Defendant's

7  Motion for Summary Judgment (ECF No. 50) be **GRANTED**.

8  **I.   PROCEDURAL HISTORY**

9         Plaintiff commenced the present action on July 25, 2014.  (ECF No. 1.)  On

10  September 3, 2014, the District Court granted Plaintiff's Motion to Proceed *In Forma*

11  *Pauperis* pursuant to 28 U.S.C. § 1915(a).  (ECF No. 4.)  On December 31, 2014, Plaintiff

12  filed a First Amended Complaint alleging excessive force and equal protection claims

13  against Defendant.  (ECF No. 8.)  Defendant answered the First Amended Complaint on

14  June 30, 2015.  (ECF No. 31.)

15         On April 19, 2016, Defendant filed his Motion for Summary Judgment pursuant to

16  Federal Rule of Civil Procedure 56.  (ECF No. 50.)  In his Motion, Defendant asserts that:

17  (1) Defendant did not violate Plaintiff's Eighth Amendment right to be free from excessive

18  force; (2) Defendant did not violate Plaintiff's Fourteenth Amendment right to equal

19  protection; (3) Defendant is entitled to qualified immunity; and (4) Plaintiff did not exhaust

20  his available administrative remedies as required by 42 U.S.C. § 1997e(a).  (ECF No. 50-

21  1.)  On April 25, 2016, the Court issued a *Klingele/Rand* Notice, which notified Plaintiff

22  of the deadline and requirements for filing an opposition to Defendant's Summary

23  Judgment Motion.  (ECF No. 52.)  Plaintiff was given until June 7, 2016, to file an

24  opposition to Defendant's Motion.  (*Id.* at 2.)  That time has since passed and Plaintiff did

25  not file an opposition.  As no opposition was filed, Defendant did not file a reply.

26  **II.   PLAINTIFF'S ALLEGATIONS**

27         Plaintiff's First Amended Complaint alleges that Defendant used excessive force

28  when he shot Plaintiff in the face during a May 27, 2014 inmate riot at Calipatria State

Prison.  (ECF No. 8 at 3.)  Plaintiff alleges that Defendant shot him because Defendant wanted to hurt him.  (*Id.*)  In addition, Plaintiff claims that Defendant's alleged use of excessive force was racially motivated.[3]  (*Id.*)  In support of this allegation, Plaintiff states that prior to being shot by Defendant, he had been fighting off three African American inmates in an attempt to defend himself.  (*Id.*)  When Defendant visited Plaintiff in the hospital the day after the riot, Defendant allegedly shouted at Plaintiff that he should not have "knocked out [Defendant's] people," Defendant's "boys."  (*Id.* at 3–4.)

Plaintiff's First Amended Complaint also notes that Plaintiff repeatedly sought administrative relief from Calipatria State Prison given the "seriousness of the situation" that required "emergency and prompt action," but his administrative appeal was canceled at the second level of review and rejected at the third level of review.  (*Id.* at 6.)

## III.   STATEMENT OF FACTS[4]

### A.   The Prison Riot

On May 27, 2014, an inmate riot erupted on the Facility A yard at the Calipatria State Prison.  (ECF No. 8 at 3; ECF No. 50-5 at ¶ 2.)  Defendant responded, as required by prison policy and procedure, by obtaining a 40-millimeter direct impact launcher and five foam rounds from the prison's Security and Investigations Main Office and heading to the riot.[5]  (ECF No. 50-5 at ¶ 2.)  A 40-millimeter direct impact launcher is a "less-than-lethal" device used to disable violent aggressors in prison crowd control situations.  (*Id.* at ¶ 5.)  The rubber nose of each foam round is designed specifically to distribute the force of

---

[3] Plaintiff is Hispanic and Defendant is African American.  (ECF No. 50-5 at ¶ 23.)

[4] Because Defendant's Motion for Summary Judgment is unopposed, the statement of facts is taken from Defendant's Motion for Summary Judgment and the declarations filed in support thereof, except where noted otherwise.

[5] The Court notes an inconsistency in Defendant's declaration filed in support of his Motion for Summary Judgment.  Defendant's declaration states that he obtained five foam rounds upon receiving notice of the riot (ECF No. 50-5 at ¶ 2) but that he fired a total of seven foam rounds during the riot (*id.* at ¶¶ 7, 8, 10, 12, 13, 16).  However, because the issue of whether Defendant fired five or seven total rounds is not material to either of Plaintiff's claims against Defendant, and because Plaintiff provides no evidence that would create a jury issue as to Defendant's credibility, the Court finds that the inconsistency in Defendant's declaration is not fatal to Defendant's Motion for Summary Judgment.

impact over a wide area.  (*Id.*)  The particular launcher Defendant used the day of the riot fired only one round at a time and required reloading after every round fired.  (*Id.*)

Upon arriving at the Facility A yard, Defendant saw several Hispanic and African American inmates fighting each other.  (*Id.* at ¶ 3.)  Defendant was later informed that nearly 300 inmates participated in the riot.  (*Id.*)  Due to the number of inmates involved, it was difficult for Defendant to identify any of the fighting inmates with particularity.  (*Id.*)

Defendant and the other responding correctional officers formed a "skirmish line" to attempt to monitor and contain the riot.  (*Id.* at ¶ 4.)  Defendant and the other officers repeatedly shouted for the inmates to stop fighting and to get down on the ground.  (*Id.* at ¶ 6.)  The inmates ignored the officers' requests.  (*Id.*)  During the riot, Defendant saw several other officers firing their 40-millimeter direct impact launchers and heard the sound of a Mini 14 rifle, a small, lightweight semi-automatic rifle that is considered lethal force, being fired.  (*Id.*)  Despite the sound of a Mini 14 rifle firing, which usually causes inmates to get down on the ground, the inmates continued to fight.  (*Id.*)  This indicated to Defendant that the inmates were determined to hurt each other despite the correctional staff's efforts to stop their fighting.  (*Id.*)

Defendant monitored the riot and observed an African American inmate and Hispanic inmate fighting approximately 30 yards from him.  (*Id.* at ¶7.)  After the inmates ignored Defendant's yells to get down and because Defendant thought that one of the inmates would be seriously injured or killed if they continued to fight, Defendant fired a foam round at the lower extremities of the Hispanic inmate.  (*Id.*)  The round hit the inmate on the right leg.  (*Id.*)

Defendant reloaded his 40-millimeter direct impact launcher and observed several African American and Hispanic inmates fighting approximately 35 yards from him.  (*Id.* at ¶ 8.)  After the inmates ignored Defendant's yells to get down and because Defendant feared that one or more of the inmates would be seriously injured or killed if they continued to fight, Defendant fired a foam round at an African American inmate.  (*Id.*)  Defendant missed his target.  (*Id.*)  Defendant then reloaded his launcher and, after shouting several

times for the inmates to get down, fired again at the same group of inmates.  (*Id.*)  The round hit the ground.  (*Id.*)

At some time thereafter, the inmates briefly separated according to race.  (*Id.* at ¶ 9.)  However, both groups eventually stood up, advanced toward each other, and continued to fight.  (*Id.*)  Defendant again located a group of African American and Hispanic inmates fighting approximately 35 yards from him and ordered them to get down.  (*Id.* at ¶ 10.)  When the inmates ignored Defendant's verbal orders and because Defendant believed one or more of the inmates would be seriously injured or killed if they continued to fight, Defendant fired a foam round at the lower extremities of an African American inmate who appeared to be an aggressor in the fight.  (*Id.*)  Defendant missed his target.  (*Id.*)

The inmates briefly separated again, but they eventually resumed fighting.  (*Id.* at ¶¶ 11–12.)  Defendant then saw a Hispanic inmate punching an African American inmate in the face and body, approximately 35 yards away.  (*Id.* at ¶ 12.)  Defendant ordered the inmates to get down, but they ignored his orders.  (*Id.*)  Defendant fired a round at the lower extremities of the Hispanic inmate, and the round hit the inmate in the buttocks.  (*Id.*)

Defendant reloaded his 40-millimeter direct impact launcher and continued to monitor the riot.  (*Id.* at ¶ 13.)  He located a group of Hispanic inmates fighting with a group of African American inmates approximately 40 yards away.  (*Id.*)  Defendant ordered them to get down.  (*Id.*)  The inmates ignored his orders.  (*Id.*)  Because Defendant believed that one or more of the inmates would be seriously injured or killed if they continued to fight, Defendant fired a round at the lower extremities of one of the Hispanic inmates in the group.  (*Id.*)  Defendant states that after firing the round, he observed a different inmate, later identified as Plaintiff, run in a crouched position in front of the inmate that Defendant intended to hit, toward a group of African American inmates.  (*Id.* at ¶ 14.)  The round struck Plaintiff on the right side of his face.  (*Id.*; ECF No. 50-5 at ¶ 14.)  Defendant states that he did not see or target Plaintiff prior to firing the round that impacted Plaintiff.  (ECF No. 50-5 at ¶ 14.)  Plaintiff's First Amended Complaint states that Plaintiff was not running in a crouched position but standing upright at the time he was shot by Defendant.  (ECF

No. 8 at 3.)  Plaintiff asserts that Defendant intended to hurt Plaintiff when he shot Plaintiff in the face.  (ECF No. 8 at 3.)

After being hit by Defendant's round, Plaintiff ran toward the handball court and sat down where other Hispanic inmates had gathered.  (ECF No. 50-5 at ¶ 15.)  Because it was possible that Plaintiff had been injured seriously, Defendant continually monitored Plaintiff from the skirmish line until the prison's medical staff could treat him.  (*Id.*)

Defendant reloaded his launcher and observed several African American and Hispanic inmates fighting approximately 40 yards from him.  (*Id.* at ¶ 16.)  Defendant and the other officers shouted at the inmates to get down, but the inmates ignored their orders.  (*Id.*)  Because Defendant believed that one of the inmates would be seriously injured or killed if the fighting continued, Defendant fired a foam round at the lower extremities of an African American inmate.  (*Id.*)  The round hit the ground.  (*Id.*)

Eventually, the inmates stopped fighting, separated, and got down on the ground.  (*Id.* at ¶ 17.)  Defendant provided coverage for the other correctional officers who placed the Hispanic inmates in hand restraints and escorted them to the front of one of the housing units.  (*Id.*)  Defendant located Plaintiff while he was being escorted to the housing unit and informed the medical staff that Plaintiff had a head injury and required immediate medical attention.  (*Id.*)  Defendant then returned to the skirmish line and continued to provide coverage for the other correctional officers.  (*Id.*)

B.    **The Hospital Visit**

Due to the injuries Plaintiff sustained during the prison riot, he was transported to the Palm Springs Desert Regional Medical Center on May 27, 2014, for treatment.  (ECF No. 8 at 4; ECF No. 50-5 at ¶ 23.)  On May 28, 2014, as part of his duties as a Security and Investigation Officer, Defendant visited the hospital to interview another inmate who was involved in the riot.  (ECF No. 50-5 at ¶ 23.)  After interviewing the inmate, Defendant visited Plaintiff's hospital room to check up on Plaintiff.  (*Id.*)  Plaintiff alleges that while at the hospital, Defendant shouted at Plaintiff that he "should not have knocked out [Defendant's] people," Defendant's "boys," during the riot.  (ECF No. 8 at 3–4.)

Defendant disputes that he made these statements when he visited Plaintiff at the hospital. (ECF No. 50-5 at ¶ 23.)

### C.    Plaintiff's Injuries and Medical Recovery

Plaintiff suffered a right orbital fracture as a result of being shot by Defendant.  (ECF No. 8-2 at 13.)   In addition, Plaintiff now suffers from chronic pain and permanent blindness in his right eye.  (ECF No. 8 at 3.)

Plaintiff returned to Calipatria State Prison on May 29, 2014.  (ECF No. 8-1 at 6.) He remained in the prison's infirmary and administrative segregation unit from May 29, 2014, through July 22, 2014.[6]  (*Id.*)  Plaintiff's medical records indicate that he was alert, ambulatory, and answering medical staff's questions appropriately by June 13, 2014.  (*See* ECF No. 50-2 at 9.)  On June 14 and 15, 2014, Plaintiff stated to prison medical staff that he was "OK."  (*Id.* at 5, 7.)  On June 18, 22, and 24, 2014, Plaintiff completed, in his own handwriting, comprehensible and legible Health Care Services Request Forms to request specific treatment related to his eye injury.  (*Id.* at 14–16.)

### D.    Plaintiff's Administrative Appeal

As stated above, upon returning to the prison from the hospital, Plaintiff was housed in Calipatria State Prison's infirmary and administrative segregation unit from May 29, 2014, through July 22, 2014.  (ECF No. 8-1 at 6.)  During this period, both the infirmary and the administrative segregation unit had procedures in place for inmates to access and file administrative appeal forms.  (*See* ECF No. 50-7 at ¶¶ 2–5; ECF No. 50-12 at ¶¶ 2–4.)

In the infirmary, inmate appeal forms were kept at the correctional officer's station and were made available to inmates upon request.  (ECF No. 50-12 at ¶ 3.)  Inmates were required only to approach the on-duty correctional officer, either at the officer's desk or during the officer's rounds, and request an appeal form.  (*Id.*)  The inmate would then

---

[6] Specifically, Plaintiff asserts in his First Amended Complaint that he was "within the hospital and central health infirmary from 5-27-14 thru 6-17-14" and "in administrative segregation from 5-29-14 thru July 22, 2014 as infirm[a]ry had me AD-SEG status."  (ECF No. 8-1 at 6.)

complete the form and place it in the mailbox designated "Inmate-Appeal Mailbox" located next to the inmate pay telephones within the infirmary. (*Id.*) The forms would be collected by the first watch's Watch Commander, who would deliver the forms to Central Control for retrieval by the prison's Appeals Coordinator's Office's staff. (*Id.*) Alternatively, all inmates in the infirmary had the option to submit their inmate appeal forms to the Appeals Coordinator's Office via institutional mail. (*Id.* at ¶ 4.)

If an inmate was bedridden, correctional officers were required to deliver requested inmate appeal forms to the prisoner's bedside. (*Id.*) To request an appeal form, a bedridden inmate was required to "buzz" the on-duty medical staff, who would then inform the on-duty correctional officer of the inmate's need for an appeal form. (*Id.*) The correctional officer would then report to the inmate's bedside, ask what type of appeal form was needed (medical or non-medical), deliver the appropriate form, and then later collect the completed form from the inmate for processing. (*Id.* at ¶¶ 3–5.)

In the administrative segregation unit, a correctional officer would wheel a cart containing blank copies of various administrative forms, including inmate appeal forms, to each cell every evening. (ECF No. 50-7 at ¶ 2.) The officer would stop at each cell and ask the inmate or inmates in the cell if they needed any forms. (*Id.*) Any requested forms, and their corresponding envelopes, were passed to the inmates through the food port in their cell door. (*Id.*) The inmates could complete the forms in their cells. (*Id.*) Later in the evening, a correctional officer would again stop at each cell in the administrative segregation unit and ask the inmate or inmates in each cell whether they have any outgoing mail, which included any forms to be mailed through the institutional mail system. (*Id.* at ¶ 3.) The correctional officer would collect completed forms and place them in the "mail bag," which would be delivered to the sergeant, who would route the mail accordingly. (*Id.*)

Plaintiff submitted an administrative appeal form claiming Defendant improperly and unlawfully used excessive force on him during the May 27, 2014 prison riot. (ECF No. 50-9 at 2–5.) Plaintiff's administrative appeal was dated July 20, 2014, and was

received by the Inmate Appeals Office on July 22, 2014.  (ECF No. 50-8 at ¶ 7; ECF No. 50-9 at 2.)

After receipt by the Inmate Appeals Office, Plaintiff's administrative appeal was forwarded to the prison's Hiring Authority for a determination as to whether the appeal was timely.  (ECF No. 50-8 at ¶ 8.)  The administrative appeal requirements of the California Department of Correction and Rehabilitation ("CDCR") require that inmate administrative appeals be filed within 30 calendar days of the occurrence of the event being appealed.  Cal. Code Regs. tit. 15, § 3084.8(b).  The Hiring Authority determined Plaintiff's appeal was untimely because the issue Plaintiff sought to appeal occurred on or around May 27, 2014, Plaintiff's appeal was dated July 20, 2014, the Inmate Appeals Office received the appeal on July 22, 2014 (approximately 55 days after the incident giving rise to the appeal), and Plaintiff had the opportunity to submit the appeal within the prescribed time constraints.  (ECF No. 50-9 at 20.)  Plaintiff's appeal was canceled, and Plaintiff was notified of the Hiring Authority's decision by letter dated August 11, 2014.  (*Id.*)

In a letter to Warden W.L. Montgomery dated August 26, 2014, Plaintiff requested that his canceled appeal be processed because he had "extraordinary circumstances beyond [his] control" that prevented him from filing a timely appeal.  (ECF No. 8-1 at 6.)  Plaintiff alleges that these circumstances included that Plaintiff was in the hospital, prison infirmary, and prison administrative segregation unit from May 27, 2014, through July 22, 2014, and that Plaintiff could not see.  (*Id.*)  On August 27, 2014, Chief Deputy Warden B. Hedrick responded that Plaintiff's appeal remained canceled, as inmate appeal forms are available in both the infirmary and administrative segregation unit and Plaintiff therefore had access to the necessary forms to timely file his appeal.  (ECF No. 50-9 at 22.)

Plaintiff submitted his appeal to the CDCR's Office of Appeals in Sacramento, California, which acts as the third level of administrative review.  The Office of Appeals received Plaintiff's appeal on October 10, 2014.  (ECF No. 50-14 at ¶ 9.)  By letter dated October 28, 2014, the Office notified Plaintiff that his appeal had been canceled at a lower level and that he cannot resubmit a canceled appeal.  (ECF No. 8-1 at 3.)

## IV.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant seeks summary judgment on the grounds that: (1) Defendant did not violate Plaintiff's Eighth Amendment right to be free from excessive force; (2) Defendant did not violate Plaintiff's Fourteenth Amendment right to equal protection; (3) Defendant is entitled to qualified immunity; and (4) Plaintiff did not exhaust available administrative remedies as required by 42 U.S.C. § 1997e(a).  (ECF No. 50-1 at 20–31.)

### A.   Summary Judgment Pursuant to Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses and thereby "secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Summary judgment is appropriate if the materials in the record, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc).

Each party's position as to whether a fact is disputed or undisputed must be supported by: (1) citation to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) a showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3).  If a party supports its motion by declaration, the declaration must set out facts that would be admissible in evidence and show that the affiant or declarant is competent to testify on the matters stated.  Fed. R. Civ. P. 56(c)(4).  An affidavit will not suffice to create a genuine issue of material fact if it is "conclusory, self-serving . . . [and] lacking detailed facts and any supporting evidence."  *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

When a defendant seeking summary judgment has carried its burden under Rule 56(c), the burden shifts to the plaintiff who "must do more than simply show that there is

some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).  The plaintiff "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita*, 475 U.S. at 587 (emphasis in original) (internal citation omitted).  If the plaintiff fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 325.  "The Court may . . . grant an unopposed motion for summary judgment if the moving party's papers are themselves sufficient to support the motion and do not on their face reveal a genuine issue of material fact."  *Hupp v. San Diego Cty.*, No. 12cv0492 GPC (RBB), 2014 WL 3573337, at *7 (S.D. Cal. July 21, 2014) (citing *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001)).

A verified complaint may be used as an opposing affidavit under Rule 56 to the extent it is based on personal knowledge and sets forth specific facts admissible in evidence.  *McElyea v. Babbitt*, 833 F.2d 196, 197–98 (9th Cir. 1987) (per curiam).  To "verify" a complaint, the plaintiff must swear or affirm that the facts in the complaint are true "under the pains and penalties of perjury."  *Schroeder v. McDonald*, 55 F.3d 454, 460 n.10 (9th Cir. 1995).

### B.    Plaintiff's Eighth Amendment Excessive Force Claim

#### 1.    Legal Standard

In the context of incarceration, "only the 'unnecessary and wanton infliction of pain' constitutes cruel and unusual punishment forbidden by the Eighth Amendment."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quoting *Ingraham v. Wright*, 403 U.S. 651, 670 (1977)).  When prison officials stand accused of using excessive force against a prisoner in violation of the Eighth Amendment, the relevant judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley*, 475 U.S. at 320–21).

///

In determining whether a prison official's use of force was for the purpose of maintaining or restoring discipline or for the malicious and sadistic purpose of causing harm, a court may evaluate several relevant factors, including: (1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between the need for force and the amount of force used; (4) the threat reasonably perceived by the responsible official; and (5) any efforts made to temper the severity of a forceful response. *Id.* at 7 (citing *Whitley*, 475 U.S. at 321).  In weighing these factors, courts should accord prison administrators extensive deference in the adoption and execution of policies and practices needed to preserve internal order and discipline and to maintain prison security. *Id.* at 6 (citing *Whitley*, 475 U.S. at 321–22).  Courts should hesitate "to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance."  *Whitley*, 475 U.S. at 320.  "Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard . . . the case should not go to the jury."  *Id.* at 322.

        2.   <u>Discussion</u>

           i.   *Extent of Injury*

The extent of an inmate's injury is one factor that may suggest whether the force used against the inmate was for the malicious and sadistic purpose of causing pain.  *See Hudson*, 503 U.S. at 6.  Although the extent of a prisoner's injury is relevant in making this determination, it is not on its own decisive because a prisoner can state a claim of excessive force even if he did not suffer a significant injury.  *See id.*  Conversely, even deadly force can be applied in a good faith effort to maintain or restore discipline.  *Jeffers v. Gomez*, 276 F.3d 895, 912 (9th Cir. 2001) (citing *Whitley*, 475 U.S. at 320).

Here, it is undisputed that Plaintiff suffered a severe injury.  Plaintiff was shot in the right side of his face by a foam round (ECF No. 8 at 3; ECF No. 50-1 at 11), and he suffered an orbital fracture and permanent blindness in his right eye (ECF No. 8 at 3; ECF No. 8-2 at 5).  Accordingly, the undisputed evidence regarding Plaintiff's injury weighs in favor of a finding of an Eighth Amendment violation.

### ii.     Need for Force

Second, the Court looks at the need for the use of force in the situation at hand.  In support of his Motion for Summary Judgment, Defendant supplies his own sworn declaration, which states that by the time Defendant arrived at Calipatria State Prison's Facility A yard, approximately 300 inmates, including Plaintiff, were engaged in a wide-scale, racially motivated prison riot.  (ECF No. 50-5 at ¶ 3.)  Defendant states that the inmates involved in the riot were violently kicking and striking each other in the face and body, and some were using makeshift weapons to attack others.  (*Id.* at ¶¶ 3, 16.)  Defendant states that he personally observed several altercations that could have resulted in serious injury or death to one or more of the inmates involved (*id.* at ¶¶ 7, 8, 10, 13, 16), and the video recording of the incident shows several large groups of inmates fighting aggressively in the prison yard (ECF No. 50-6).  In addition, Defendant states that despite the responding correctional officers' establishing a skirmish line, repeatedly ordering the inmates to get down on the ground, and firing a Mini 14 rifle, the inmates did not get down on the ground.  (ECF No. 50-5 at ¶¶ 6, 7, 8, 10, 13, 16; ECF No. 50-6 at 10:13–10:20.)

Plaintiff states in his verified First Amended Complaint[7] that he was involved in the riot only to defend himself from other attacking inmates.  (ECF No. 8 at 3.)  However, Plaintiff does not dispute and the video recording of the riot shows that immediately before Plaintiff was shot[8] he was present at the scene of the riot, he was located in the immediate vicinity of dozens of other fighting inmates, he did not obey the prison officers' verbal orders to get down on the ground, and instead he was standing upright and staring at an inmate with whom he had just been fighting.  (*see id.*; ECF No. 50-6 at 10:13–10:20.)

---

[7] Although Plaintiff did not file an opposition to Defendant's Motion for Summary Judgment, the Court treats Plaintiff's First Amended Complaint as an opposing affidavit with respect to factual assertions that are based on Plaintiff's personal knowledge because it is verified.  *See Williams v. Paramo*, 775 F.3d 1182, 1192 n.11 (9th Cir. 2015).

[8] Plaintiff can be seen on the video recording immediately before and after he was shot by Defendant; however, the video pans away from Plaintiff and fails to capture the moment when Defendant's foam round made contact with Plaintiff.  (*See* ECF No. 50-6 at 10:13–10:30.)

The evidence above indicates that the rioting prisoners, including Plaintiff, were not responding to Defendant's non-forceful tactics to quell the riot. Accordingly, this factor weighs against a finding of an Eighth Amendment violation.

iii.    *Relationship Between the Need for Force and the Force Used*

The third relevant inquiry is whether the amount of force used by the prison official was responsive to the need for force. Case law indicates that applied force must be balanced against the need for that force. *See Douglas*, 2014 WL 3534702, at *12 (citing *Alexander v. City and Cty. of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994)). As established above, Plaintiff and the other inmates were not responding to Defendant's non-forceful tactics to quell the riot. There also existed a risk of serious injury or death to one or more inmates if the riot was not stopped. Defendant states that to stop the threat posed by the fighting inmates, he shot a foam round from a 40-millimeter direct impact launcher at several of the inmates involved in the riot. (ECF No. 50-5 at ¶¶ 7, 8, 10, 12, 13, 16.) Defendant states the 40-millimeter direct impact launcher is designed to deliver a "less-than-lethal" force. (ECF No. 50-5 at ¶ 5.) While the intended purpose of the 40-millimeter direct impact launcher is to disable its target, the nose of the foam round is specifically designed to distribute the force of impact over a wide area (*id.*), thereby lessening the amount of pain felt by the target. In addition, the 40-millimeter direct impact launcher Defendant used during the riot was not an automatic weapon but instead a weapon that required reloading after every use (*id.*), thereby limiting the frequency by which Defendant could use it against the inmates. Plaintiff does not dispute that Defendant's use of a 40-millimeter direct impact launcher during the riot was a proportionate use of force given the situation at hand. (*See* ECF No. 8.) Accordingly, this factor weighs against a finding of an Eighth Amendment violation.

iv.    *Threat Perceived*

The fourth relevant factor is the reasonableness of the threat perceived by the responding official. Defendant states that when he arrived at the riot he observed prisoners kicking and striking each other in the face and upper body and, in some cases, using

makeshift weapons to hurt others.  (ECF No. 50-5 at ¶¶ 7, 8, 10, 12, 13, 16.)  Defendant states that he believed and feared that one or more inmates would be seriously injured or killed if they continued to fight.  (*Id.*)  In addition, Defendant states that he was aware from past personal experience and job training that riot situations often result in serious injury and death to both inmates and correctional staff if they are not quickly controlled.  (*Id.* at ¶ 19.)

Plaintiff's verified First Amended Complaint alleges that Plaintiff was fighting with other inmates during the riot only to defend himself and that he was at a standstill with these inmates at the time he was shot.  (ECF No. 8 at 3.)  However, Plaintiff does not dispute and the video recording of the riot shows that immediately before Plaintiff was shot he was present at the scene of the riot, he was located in the immediate vicinity of dozens of other fighting inmates, he did not obey the prison officers' verbal orders to get down on the ground, and instead he was standing upright and staring at an inmate with whom he had just been fighting.  (ECF No. 50-6 at 10:13–10:20; *see* ECF No. 8 at 3.)  The undisputed facts show that it was not unreasonable for Defendant to view Plaintiff and the other rioting inmates as a threat to the prison's security.  Accordingly, this factor weighs against a finding of an Eighth Amendment violation.

### v.    *Efforts to Temper Force*

The fifth relevant factor to consider is the responsible officer's efforts to minimize the severity of the forceful response.  Defendant states that before firing any foam round, including the one that contacted Plaintiff, Defendant ordered the inmates at which he fired to stop fighting and to get on the ground.  (ECF No. 50-5 at ¶¶ 7, 8, 10, 12, 13, 16.)  In addition, Defendant states that he fired the 40-millimeter direct impact launcher only after the inmates ignored his verbal orders and when he believed serious injury or death might result if the fighting continued.  (*Id.*)  Furthermore, Defendant states that to minimize the severity of the force used, he aimed for the lower extremities of the inmates he targeted.  (*Id.*)  None of the evidence of Defendant's general efforts to minimize the severity of his forceful response is disputed by Plaintiff.

15

With respect to the shooting of Plaintiff, however, the facts with respect to Defendant's minimization efforts are disputed. Defendant states that with respect to Plaintiff, he neither saw nor targeted Plaintiff when he fired the foam round that contacted him. (*Id.* at ¶ 14.) He states that Plaintiff was inadvertently hit in the face with Defendant's foam round only because Plaintiff ran, in a crouched position, in front of the lower extremities of another inmate that Defendant had targeted. (*Id.*)

Plaintiff's verified First Amended Complaint contains factual allegations that contradict these statements of Defendant. The First Amended Complaint states that at the time Plaintiff was hit by Defendant's foam round, Plaintiff was not running in a crouched position but was instead standing upright and at a standstill with two other inmates. (ECF No. 8 at 3.) In addition, an administrative grievance prepared by Plaintiff that Plaintiff attached to his First Amended Complaint, and that Defendant attached to the declaration of P. Nava filed in support of Defendant's Motion for Summary Judgment, states that Plaintiff was shot in the face by Defendant's foam round "while [Plaintiff] was standing." (ECF Nos. 8-1 at 11; 50-9 at 4.) Viewed in the light most favorable to the Plaintiff, these facts, if established, support an argument that Plaintiff was standing upright when shot in the face, and therefore Defendant was aiming at his face and not at his (or another's) lower extremities.

Defendant argues that the Court should not adopt Plaintiff's version of events because the video recording of the prison riot contradicts Plaintiff's statements. (ECF No. 50-1 at 22–23.) Although Plaintiff can be seen on the video recording immediately before and after he was shot by Defendant, the video pans away from Plaintiff and fails to capture Plaintiff's posture at the time Defendant's foam round made contact with him. (*See* ECF No. 50-6 at 10:13–10:30.) Because the video recording does not "blatantly contradict[]" Plaintiff's version of the events such that no reasonable jury could believe Plaintiff, *Scott v. Harris*, 550 U.S. 372, 380 (2007), the Court cannot disregard Plaintiff's statements for purposes of ruling on Defendant's Motion for Summary Judgment.

///

The Court concludes that the undisputed evidence shows that Defendant tempered the severity of the force applied by using non-lethal foam rounds and firing only after repeated efforts to get the rioting inmates to desist.   Further, there is no dispute that Defendant tempered the severity of the force applied by aiming at the prisoners' lower extremities generally.   However, viewing the evidence in the light most favorable to Plaintiff, there is a dispute as to whether, in the case of Plaintiff, Defendant tempered the severity of the force applied by aiming at his lower extremities or whether he was firing at Plaintiff's face as Plaintiff stood upright.   Therefore, this factor weighs slightly in favor of a finding of an Eighth Amendment violation.

### vi.   Other Factors

The Court finds that there is other evidence in Defendant's moving papers and in Plaintiff's First Amended Complaint that establishes a genuine issue of material fact as to whether Defendant shot Plaintiff with a malicious and sadistic purpose.   As noted above, Plaintiff is Hispanic and Defendant is African American.   (ECF No. 50-5 at ¶ 23.) Plaintiff's First Amended Complaint states that Plaintiff had been "fighting off three black prisoners," he had "backed one inmate back with [his] fists," and he was "at a standstill staring at" two other African American inmates immediately before Defendant shot Plaintiff.   (ECF No. 8 at 3.)   Plaintiff's First Amended Complaint also states that on the day after the riot, Defendant visited Plaintiff at the hospital and shouted at Plaintiff that he should not have "knocked out [Defendant's] people," Defendant's "boys."   (*Id.* at 3–4.) While Defendant disputes that he said these things to Plaintiff and argues he never acted with a racial animus toward Plaintiff (ECF No. 50-5 at ¶ 23), when viewed in the light most favorable to Plaintiff, it is plausible that the evidence above would allow a reasonable jury to find that Defendant acted with a racially motivated malicious intent when he shot Plaintiff.

Second, while Defendant states that he fired foam rounds at both African American and Hispanic inmates during the riot (ECF No. 50-5 at ¶¶ 3, 7, 8, 10, 12, 13, 16), the facts contained in Defendant's declaration, when taken as a whole, establish a genuine issue of material fact as to whether Defendant's shooting Plaintiff was racially motivated.

Specifically, the declaration indicates that Defendant hit an Hispanic inmate every time he aimed at one (*id.* at ¶¶ 7, 12–14), while he missed every African American inmate that he targeted (*id.* at ¶¶ 8, 10, 16).  When viewed in the light most favorable to Plaintiff, it is plausible that this evidence would allow a reasonable jury to find that Defendant intentionally hit Plaintiff with a foam round based on Plaintiff's Hispanic ethnicity.[9]  This factor weighs in favor of a finding of an Eighth Amendment violation.

### vii.   Conclusion

Based on the evidence above, there are genuine issues of material fact as to whether Defendant acted with a malicious and sadistic purpose when he shot Plaintiff.  First, two of the five factors commonly used to assess claims of excessive force weigh in favor of finding that Defendant applied force in a malicious and sadistic manner for the purpose of harming Plaintiff.  Plaintiff was shot in the side of his face, causing a severe injury to his eye, and Plaintiff's First Amended Complaint contains facts that call into question whether Defendant made a sufficient effort to temper the force he used against Plaintiff.  Second, the fact that Plaintiff was allegedly defending himself from three African American inmates immediately before he was shot, coupled with the facts contained in Defendant's declaration and the statements that Plaintiff alleges Defendant made while visiting Plaintiff in the hospital, provide evidence from which a reasonable jury could infer that Defendant maliciously intended to cause harm to Plaintiff based on Plaintiff's ethnicity.  Accordingly, the evidence presented establishes genuine issues of material fact as to whether Defendant used excessive force on Plaintiff when he shot Plaintiff in the face during the May 27, 2014 riot.  The Court therefore recommends that Defendant's Motion for Summary Judgment as to Plaintiff's excessive force claim be **DENIED**.

---

[9] While the Court recognizes that Plaintiff did not raise this argument on his own because he failed to file an opposition to Defendant's Motion for Summary Judgment, the Court cannot ignore that Defendant's moving papers establish the existence of a genuine issue of material fact.  *See Hupp*, 2014 WL 3573337, at *7 (citing *Carmen*, 237 F.3d at 1029) (concluding that a Court may grant an unopposed motion for summary judgment only if the moving party's papers themselves, on their face, do not reveal a genuine issue of material fact).

### C.   Plaintiff's Fourteenth Amendment Equal Protection Claim

#### 1.   Legal Standard

The Equal Protection Clause of the Fourteenth Amendment "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). To establish a violation of the Equal Protection Clause, a plaintiff must show that a defendant acted with an intent or purpose to discriminate against him based upon his membership in a protected class, such as race. *Barren v. Harrington*, 152 F.3d 1193, 1194–95 (9th Cir. 1998).

#### 2.   Discussion

Plaintiff's First Amended Complaint alleges that Defendant's conduct was deliberate and racially motivated. Specifically, Plaintiff alleges that Defendant shot him because Plaintiff is Hispanic, Defendant is African American, and Plaintiff was involved in an altercation with African American inmates during the riot. (ECF No. 8 at 3–4.) Defendant argues that the evidence shows he never acted with a racial animus toward Plaintiff. (ECF No. 50-1 at 25.)

Defendant's declaration states that when Defendant arrived at the scene of the prison riot, there was a large number of African American and Hispanic inmates fighting with each other. (ECF No. 50-5 at ¶¶ 3, 7.) Defendant states that he shot foam rounds at both African American and Hispanic prisoners during the riot. (*Id.* at ¶¶ 3, 7, 8, 10, 12, 13, 16.) With respect to Plaintiff, Defendant states that he neither saw nor targeted Plaintiff prior to firing the foam round that contacted him. (*Id.* at ¶ 14.) Rather, Plaintiff was hit inadvertently when he ran, in a crouched position, in front of the lower extremities of another Hispanic inmate that Defendant had targeted. (*Id.*) In addition, Defendant states that after he noticed that Plaintiff had been hit by the foam round, he tracked Plaintiff's whereabouts in the yard until Plaintiff could be treated by medical staff. (*Id.* at ¶ 15.) Then, when all of the inmates had stopped fighting and had separated, Defendant located Plaintiff and advised the medical staff that Plaintiff required immediate attention. (*Id.* at ¶ 17.)

Furthermore, Defendant states that when he visited Plaintiff in the hospital the day after the riot, he never told Plaintiff that he "should not have knocked out [Defendant's] people." (*Id.* at ¶ 23.)  He states that he checked up on Plaintiff to see how he was doing.  (*Id.*)

Plaintiff's verified First Amended Complaint states that Plaintiff had been "fighting off three black prisoners," had "backed one inmate back with [his] fists," and was "at a standstill staring at" the two other African American inmates immediately before Defendant shot Plaintiff.  (ECF No. 8 at 3.)  In addition, Plaintiff's verified First Amended Complaint states that Defendant shouted at Plaintiff that he "should not have knocked out [Defendant's] people" while visiting Plaintiff at the hospital.  (*Id.* at 3–4.)  Furthermore, as discussed above, Defendant's declaration indicates that Defendant always made bodily contact when he shot at Hispanic inmates (*id.* at ¶¶ 7, 12–14), while he always missed when he shot at African American inmates (*id.* at ¶¶ 8, 10, 16).

Viewing the evidence above in the light most favorable to Plaintiff, it is plausible that a reasonable jury could find that Defendant intentionally shot Plaintiff based on Plaintiff's Hispanic ethnicity.  Thus, the Court finds that the evidence presented establishes a genuine issue of material fact as to whether Defendant violated Plaintiff's Fourteenth Amendment right to equal protection.  The Court therefore recommends that Defendant's Motion for Summary Judgment as to Plaintiff's equal protection claim be **DENIED**.

### D. Defendant's Qualified Immunity[10]

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The purpose of qualified immunity is to strike a balance between the competing

---

[10] Defendant does not contend in his Motion for Summary Judgment that he is entitled to qualified immunity with respect to Plaintiff's Fourteenth Amendment equal protection claim.  (*See* ECF No. 50-1 at 25–27.)  Therefore, the Court addresses whether Defendant is entitled to qualified immunity only with respect to Plaintiff's Eighth Amendment excessive force claim.

"need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

The courts conduct a two-prong analysis to determine whether a government official is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). First, examining the alleged facts in favor of the plaintiff, the court must consider whether the alleged facts show the government official's actions violated the plaintiff's constitutional rights. *Id.* at 201. Second, the court must determine whether the constitutional right purportedly violated was clearly established in the specific context of the case at hand. *Id.* A constitutional right is clearly established if it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.* at 202. This standard "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Jeffers*, 267 F.3d at 910 (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam)).

As discussed above, when viewed in the light most favorable to Plaintiff, the facts in this case show a potential violation of Plaintiff's Eighth Amendment right to be free from excessive force. Having satisfied the first prong of the qualified immunity analysis, the Court must consider whether the potentially violated constitutional right was clearly established in the specific context of the instant case. *Saucier*, 533 U.S. at 202. Whether a constitutional right is clearly established is an objective standard. *Clairmont v. Sound Mental Health*, 632 F.3d at 1091, 1109 (9th Cir. 2011) (citing *Fogel v. Collins*, 531 F.3d 824, 833 (9th Cir. 2008)). As the Ninth Circuit instructed in *Marquez v. Gutierrez*, the Court must approach *Saucier*'s second prong from the perspective of a reasonable officer on the scene without regard to the malicious intent ascribed to him by the plaintiff. *See* 322 F.3d at 693 ("[A defendant]'s claim of qualified immunity is not defeated simply because a triable issue of fact exists as to whether his decision to shoot [the plaintiff] was malicious."). Thus, the issue that remains is whether, in light of the existing law in 2014, a reasonable officer standing in Defendant's shoes would have understood that his actions

violated Plaintiff's Eighth Amendment right to be free from excessive force.

The Ninth Circuit's decision in *Marquez* is instructive on this issue. In *Marquez*, an inmate brought an excessive force claim against the correctional officer who shot him in the leg with a Mini 14 rile during a prison yard fight. *See* 322 F.3d at 691; *Avratin v. Bermudez*, 420 F. Supp. 2d 1121, 1125 & n.1 (S.D. Cal. 2006). The plaintiff claimed that he was a passive bystander to the fight, standing approximately three to four feet from the inmate being attacked; that he, as well as the inmates involved in the fight, were unarmed; and that no one was in danger of great bodily harm. *Marquez*, 322 F.3d at 691–92. On these alleged facts, the court found the plaintiff had demonstrated an Eighth Amendment violation. *Id.* at 692. However, applying an objective standard and viewing the incident from the perspective of "a reasonable official standing where [the defendant] was standing," the court concluded that the correctional officer was entitled to qualified immunity. *Id.* at 692–93. Specifically, the court concluded that a reasonable official in the situation that the defendant confronted could perceive that the plaintiff was kicking another inmate and threatening him with serious injury or death, even if no kick was actually administered by the plaintiff. *Id.* at 693. In this light, the Court concluded, "a reasonable officer could believe that shooting one inmate in the leg to stop an assault that could have seriously injured or killed another inmate was a good faith effort to restore order, and thus lawful." *Id.*

For reasons similar to those stated in *Marquez*, this Court concludes that Defendant is entitled to qualified immunity on Plaintiff's Eighth Amendment claim because it would not be clear to a reasonable officer in Defendant's position that his conduct was unlawful. First, a reasonable officer standing in Defendant's shoes could conclude that the prison riot posed a significant risk of serious bodily injury or death to the inmates involved and that there was a need for the application of force to restore order to the prison. As Defendant's declaration states, approximately 300 inmates, including Plaintiff, were involved in a racially motivated riot, and Defendant observed inmates violently kicking and striking each other in the face and body. (ECF No. 50-5 at ¶ 3.) Some even used makeshift weapons to

attack others.  (*Id.* at ¶¶ 3, 16.)  In addition, Defendant observed that the rioting inmates were not responding to the sounds of a Mini 14 rifle or the correctional officers' verbal commands to get down on the ground.  (*Id.* at ¶ 4.)  A reasonable officer confronted with this situation could conclude that non-forceful tactics to quell the riot were ineffective and the application of force was necessary to restore order to the prison.

Second, a reasonable officer could conclude that disabling Plaintiff, particularly, was a good faith effort to restore order and discipline to the prison.  While Plaintiff asserts that he was involved in the riot only to defend himself from other inmates (ECF No. 8 at 3), Plaintiff does not dispute, and the video recording of the riot shows, that immediately before Plaintiff was shot he was present at the scene of the riot, he was located in the immediate vicinity of dozens of other fighting inmates, he did not obey the prison officers' verbal orders to get down on the ground, and instead he was standing upright and staring at another inmate with whom he had just been fighting.  (ECF No. 50-6 at 10:13–10:20; *see* ECF No. 8 at 3.)  As the Ninth Circuit concluded in *Marquez*, when faced with these circumstances, a reasonable officer could perceive that Plaintiff was threatening another inmate with serious injury or death, even if no harmful act was actually being performed by Plaintiff in that moment.  A reasonable officer could further believe that shooting Plaintiff with a foam round to stop an assault that could have seriously injured another inmate constitutes a good faith effort to restore order.  *See Marquez*, 322 F.3d at 692–93.

Third, a reasonable officer in Defendant's position could conclude that the amount of force Defendant used against Plaintiff was lawful.  Prior to 2014, both the U.S. Supreme Court and the Ninth Circuit had held that a prison guard is permitted to use deadly force in a good faith effort to maintain or restore prison discipline during prison riots.  *Whitley*, 475 U.S. at 320; *Jeffers*, 267 F.3d 912.  In the instant case, Defendant applied less-than-lethal force when he shot Plaintiff.  He used a 40-millimeter direct impact launcher that fires foam rounds.  (ECF No. 50-5 at ¶¶ 5, 13–14.)  Accordingly, a reasonable officer standing in Defendant's shoes could conclude that the use of a 40-millimeter direct impact launcher was a lawful application of force in the situation at hand.

For the reasons above, a reasonable officer could believe that Defendant's conduct in the instant case was lawful. Accordingly, the Court recommends that Defendant's Motion for Summary Judgment based on qualified immunity with respect to Plaintiff's excessive force claim be **GRANTED**.

### E.   Plaintiff's Exhaustion of Administrative Remedies

#### 1.   Legal Standards

##### i.   *Statutory Exhaustion Requirement*

Pursuant to the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 524 (2002). "Once within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory." *Porter*, 534 U.S. at 532. This statutory exhaustion requirement applies to all inmate suits about prison life, *id.*, regardless of the relief sought by the prisoner or the relief offered by the process. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "[T]o properly exhaust administrative remedies, prisoners must 'complete the administrative review process in accordance with the applicable rules,' . . .—rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (quoting *Woodford*, 548 U.S. at 88.) An inmate who is currently on parole and who is bringing suit for an incident that occurred while incarcerated is not excused from the administrative exhaustion requirement. *See Jackson v. C.D.C.R.*, No. C 12-2516 CRB (PR), 2015 WL 695412, at *3 (N.D. Cal. Feb. 18, 2015); *Howard v. Baca*, No. CV 10-5081-JFW (OP), 2011 WL 5570086, at *5 (C.D. Cal. Sept. 27, 2011); *report and recommendation adopted*, No. CV 10-5081-JFW (OP), 2011 WL 5570142 (C.D. Cal. Nov. 15, 2011); *Medley v. Luther*, No. CV 08-4218 DOC (E), 2008 WL 5103209, at *3 (C.D.

Cal. Dec. 3, 2008).

The only recognized limitation to the exhaustion requirement is that the administrative remedies must be *available* to the prisoner. "Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement. The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" *Ross v. Blake*, 136 S. Ct. 1850, 1862 (2016). Indeed, "the PLRA requires only that a prisoner exhaust available remedies, and [] a failure to exhaust a remedy that is effectively unavailable does not bar a claim from being heard in federal court." *McBride v. Lopez*, 807 F.3d 982, 986 (9th Cir. 2015) (citing *Nunez v. Duncan*, 591 F.3d 1217, 1225–26 (9th Cir. 2010); *accord Albino*, 747 F.3d at 1177. "To be available, a remedy must be available 'as a practical matter'; it must be 'capable of use; at hand.'" *Albino*, 747 F.3d at 1171.

Because the failure to exhaust is an affirmative defense, Defendant bears the burden of raising it and proving its absence. *Jones*, 549 U.S. at 216; *Albino*, 747 F.3d at 1166. "In the rare event that a failure to exhaust is clear on the face of the complaint, a defendant may move for dismissal under Rule 12(b)(6)." *Albino*, 747 F.3d at 1166. Otherwise, a defendant must produce evidence proving the Plaintiff's failure to exhaust, and they are entitled to summary judgment under Rule 56 only if the undisputed evidence, viewed in the light most favorable to the Plaintiff, shows he failed to exhaust. *Id.*

### ii.   *CDCR Administrative Appeal Requirements*

In California, the CDCR's administrative exhaustion requirements are described in Title 15 of the California Code of Regulations. The CDCR has a three-level administrative appellate review process whereby an inmate or parolee "may appeal any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare."[11]

---

[11] "Department means the California Department of Corrections and Rehabilitation." Cal. Code Regs. tit. 15, § 3000.

Cal. Code Regs. tit. 15, § 3084.1(a).  An inmate's administrative remedies for a claim are not deemed exhausted until the claim is "addressed through all required levels of administrative review up to and including the third level."  Cal. Code Regs. tit. 15, § 3084.1(b) ("[A]ll appeals are subject to a third level of review, as described in section 3084.7, before administrative remedies are deemed exhausted.").  To initiate the appeal process, an inmate or parolee must submit the appeal directly to the appeals coordinator at their institution within 30 calendar days of the occurrence of the event or decision being appealed.  Cal. Code Regs. tit. 15, § 3084.8(b)(1).

2.   <u>Discussion</u>

Defendant argues that his Motion for Summary Judgment should be granted because Plaintiff's administrative appeal was untimely filed and properly rejected, and therefore Plaintiff failed to exhaust his available administrative remedies.  (ECF No. 50-1 at 20.)  In support of his argument, Defendant supplies Plaintiff's prison medical records (ECF No. 50-2), as well as the declarations of P. Nava, a Correctional Counselor II who has worked as the Inmate Appeals Coordinator at Calipatria State Prison since November 2012 (ECF No. 50-8); A. Panduro, a Correctional Officer at Calipatria State Prison who was assigned as Plaintiff's staff assistant during the rules violation proceedings that followed the riot (ECF No. 50-10); and J. Jimenez and G. Trujillo, Correctional Lieutenants at Calipatria State Prison (ECF No. 50-7; ECF No. 50-12).

As discussed above, if administrative remedies were available to Plaintiff pre-suit, he was required to exhaust them before filing suit with this Court.  Cal. Code Regs. tit. 15, § 3084.1.  This included complying with the prison's "deadlines and other critical procedural rules" for filing administrative appeals.  *See Woodford*, 548 U.S. at 90.  Plaintiff alleges in his First Amended Complaint that he did not timely file an administrative appeal because he was in the hospital, infirmary, and administrative segregation unit, he could not see, and his medication "slow[ed] him down" (ECF No. 8-1 at 5–6.)  However, the evidence provided by Defendant shows that administrative appeal forms were available to Plaintiff and that Plaintiff was physically and mentally capable of completing and filing an

26

appeal form within the 30 calendar days following the prison riot that gave rise to Plaintiff's claims.

Plaintiff returned to prison from the hospital on May 29, 2014. (*See* ECF No. 8-1 at 6.) He was housed in Calipatria State Prison's infirmary and administrative segregation unit from May 29, 2014, through July 22, 2014. (*Id.*) Correctional Lieutenants Jiminez and Trujillo offer undisputed declarations that administrative appeal forms were available to Plaintiff in both the infirmary and the administrative segregation unit while Plaintiff was housed there. (ECF No. 50-7 at ¶¶ 2–6; ECF No. 50-12 at ¶¶ 2–5.) The Jiminez and Trujillo declarations also show that Plaintiff did not have to leave the infirmary or administrative segregation unit to file the form. There were procedures in place whereby a correctional officer would have collected the completed form from Plaintiff in either the infirmary or administrative segregation unit the same day he completed the form and then routed the form to the appeals coordinator. (ECF No. 50-7 at ¶¶ 2–5; ECF No. 50-12 at ¶¶ 2–4.)

In addition, Plaintiff's medical records produced by Defendant show Plaintiff was mentally and physically capable of completing an administrative appeal form on or before June 26, 2014, 30 days after the May 27, 2014 riot. Prison medical staff noted that as early as June 13, 2014, Plaintiff was ambulatory and answering questions appropriately. (ECF No. 50-2 at 9.) On June 14 and 15, 2014, Plaintiff stated to prison medical staff that he was "OK." (*Id.* at 5, 7.) On June 18, 22, and 24, 2014, Plaintiff completed, in his own handwriting, comprehensible and legible Health Care Services Request Forms. (*Id.* at 14–16.) Thus, the evidence Defendant produced shows that the requisite administrative appeal form was available to Plaintiff and Plaintiff was capable of completing the form within the 30 days that followed the May 27, 2014 riot. However, Plaintiff did not submit his administrative appeal until July 20, 2014. (ECF No. 50-8 at 8.)

Plaintiff states in the documents he attached to his First Amended Complaint that he was unable to timely file an administrative appeal in part because he was not able to see and his pain medication slowed him down. (ECF No. 8-1 at 2, 5, 6.) Plaintiff offers no

specific facts, much less supporting evidence, as to the nature or extent of his physical limitations and how these limitations actually prevented him from availing himself of the administrative appeals process. *FTC*, 104 F.3d at 1171 ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."); *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (noting that self-serving affidavits uncorroborated by other evidence cannot create a disputed material fact). Plaintiff failed to provide any specific evidence that rebuts Defendant's showing that the requisite administrative appeal form was available to Plaintiff and that Plaintiff was mentally and physically capable of completing the form within the thrity days that followed the May 27, 2014 riot. As such, the Court concludes there is no genuine issue of material fact on this issue and recommends Defendant's Motion for Summary Judgment as to all of Plaintiff's claims against Defendant be **GRANTED**.

## V.   CONCLUSION

For the reasons discussed above, **IT IS HEREBY RECOMMENDED** that the District Court issue an Order: (1) accepting this Report and Recommendation; and (2) **GRANTING** Defendant's Motion for Summary Judgment (ECF No. 50).

**IT IS ORDERED** that no later than **December 7, 2016**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

///

///

///

///

///

///

///

///

1    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with

2 the Court and served on all parties no later than **December 14, 2016**.  The parties are

3 advised that failure to file objections within the specified time may waive the right to raise

4 those objections on appeal of the Court's order.  *See Martinez v. Ylst*, 951 F.2d 1153, 1156

5 (9th Cir. 1991).

6 Dated:  November 16, 2016

7

8                                                              Hon. Jill L. Burkhardt

8                                                              United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28